UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| A.B., by his Parents and Next Friends, | ) | |
| RICHARD and CHRISTA BELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:11-cv-456-SEB-DKL |
| | ) | |
| FRANKLIN TOWNSHIP COMMUNITY | ) | |
| SCHOOL CORPORATION and RISE | ) | |
| SPECIAL SERVICES, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON PENDING MOTIONS**

This cause is before the Court on cross-motions for summary judgment [Docket

Nos. 24 and 27], filed on September 2, 2011.  Plaintiff, A.B., by his Parents and Next

Friends Richard and Christa Bell (collectively, "the Parents"), brings this action against

Defendants, Franklin Township Community School Corporation and RISE Special

Services (collectively, "the School"), alleging that Defendants denied A.B. a free,

appropriate public education ("FAPE"), and thus violated the Individuals With

Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*, as incorporated in 511 IAC Article

7-32 through 7-47 ("Article 7").  On April 24, 2012, Plaintiffs filed a Motion for

Preliminary Injunction [Docket No. 33], seeking to invoke the stay-put provision of the

IDEA, 20 U.S.C. § 1415(j), and to establish the Behavior Analysis Center for Autism

("BACA 1") and its new branch, BACA Prep ("BACA 2"), as A.B.'s current educational

placement.   For the reasons detailed in this entry, we <u>DENY</u> Plaintiffs' Motion for Summary Judgment, <u>GRANT</u> Defendants' Motion for Summary Judgment, and <u>DENY</u> Plaintiffs Motion for Preliminary Injunction.

## Factual Background

A.B. is a ten-year-old student within the Franklin Township Community School District.  A.B. has mosaic trisomy 14 translocation syndrome, a rare genetic disorder in which approximately 20% of his cells have a partial copy of the fourteenth chromosome. He also suffers from a seizure disorder but it is controlled well with medication.  A.B. has no functional verbal communication skills, and thus, he communicates primarily with gestures and certain modified signs.  He has a history of having a high degree of distractibility, self-stimulatory behavior, aggressiveness when frustrated, and attention difficulties.[1]  R. at 15.  In 2007, A.B. was evaluated to determine his eligibility for special education and related services.  Following the evaluation, it was determined that he qualified for such services under the label of "Multiple Disabilities" as his primary condition and the secondary disabilities of "Autism Spectrum Disorder," "Other Health Impairments," and "Speech Impairment."  R. at 16.

A.B. began the 2007-2008 school year attending kindergarten at South Creek Elementary School, a public school which is part of the Franklin Township Community

---

[1] Individuals who have worked with A.B. during the past few years, however, have indicated that he has shown improvement in these areas as well as exhibiting an increased interest in social interaction.

School District and the Southside Special Services Cooperative, in the Comprehensive Improvement Program ("CIP").[2]  However, in March 2008, A.B. underwent an evaluation which indicated that he had experienced some regression in his communication, daily living, and socialization skills since his 2005 assessment.  Following that evaluation, the Parents withdrew A.B. from South Creek's CIP and home-schooled him for the remainder of the 2007-2008 school year.  In 2008, the Parents enrolled A.B. at the Verbal Behavior Center for Autism ("VBCA"), a private facility for children with autism.

As a result of these events, the Parents initiated two due process proceedings in 2008 which lasted into early 2009.  The parties reached settlement agreements to resolve these disputes, which called for A.B. to remain in private placement and receive services at VBCA with the after-insurance expenses paid by the School.  In July 2009, the clinical director and many staff members left VBCA and formed a new treatment center, the Behavior Analysis Center for Autism ("BACA"), which provided essentially the same programs and services.  The Parents enrolled A.B. in BACA and the School continued to pay the after-insurance costs associated with his enrollment at the private facility pursuant to the parties' settlement agreement that went into effect on July 20, 2009 and was to continue until the beginning of the 2010-2011 school year.  A.B. has remained at BACA since he began enrollment there in the fall of 2009.  However, there has never been an

---

[2] The CIP includes instruction in the areas of, *inter alia*, cognition, language, self-help skills, and fine and gross motor skills for students with moderate to severe developmental disabilities. R. at 16.

individualized educational program ("IEP")[3] that placed A.B. at BACA, or any other private facility.

While attending BACA during the 2009-2010 school year, A.B. received 23.5 hours of Applied Behavior Analysis ("ABA") therapy and eight additional hours of group instruction each week, as well as three hours of Natural Environment Teaching ("NET") monthly, where a therapist works with A.B. at home or in the community. R. at 18. ABA therapy includes the use of discrete trial training ("DTT"), which involves identifying specific skills that a student is to learn, breaking each skill into smaller tasks, arranging them in sequences, and then teaching the smaller tasks until they are mastered. Once the student learns the smaller tasks, he progresses to more advanced skills in the sequence. Tasks that can be taught using DTT include learning colors, shapes, and letters, as well as matching objects. For progress to be seen in children with autism, specialists in ABA often recommend the application of such techniques for 30-40 hours per week in one-to-one sessions with a trained therapist as well as additional small group work. R. at 17.

Each of the BACA therapists who worked with A.B. had a bachelor's degree in psychology or a related area and had received both initial and ongoing training in providing therapy and services for autistic children. R. at 19. The clinic director, Dr. Carl Sundberg, is a Lead Behavior Analyst Consultant ("LBAC") and Board Certified Behavioral Analyst ("BCBA"), with a Ph.D. in ABA. At the time of the hearing, Dr.

---

[3] An IEP is a written statement establishing how a school district will provide an IDEA-compliant education. See 20 U.S.C. § 1414(d).

Sundburg was assisted at BACA by four other BCBAs and four Board Certified Assistant Behavioral Analysts ("BCABA").  Board level certification is reserved for individuals with master's degrees and appropriate training and experience in ABA.  Such individuals are considered qualified to direct ABA programs and supervise behavior therapists.  R. at 17.

In March 2010, the School and the Parents met to discuss the upcoming case conference that would focus on developing an IEP for the 2010-2011 school year, the point at which their settlement agreement would expire.  Because the School had not completed an educational evaluation of A.B. since 2008, the Parents and the School agreed that a private psychologist, Dr. Christopher Milar, who had previously evaluated A.B. in 2006, would conduct a psychological assessment of A.B. and that a school psychologist and an autism consultant would conduct a functional behavior assessment ("FBA").  The parties did not arrange to conduct evaluations of A.B.'s speech and language skills, occupational therapy, or physical therapy.

Dr. Milar's evaluation included administration of the Bayley-II scales of ability.  Similar to the results from 2006, A.B. received a score below 50, indicating severe intellectual delays.  However, Dr. Milar determined that, since 2006, A.B.'s mental age had increased slightly by two to three months to the 13-14 month level.  In his report, Dr. Milar recommended that A.B.'s placement at BACA be maintained.  R. at 2065-67.  Following an observation of A.B. at BACA, one of the School's psychologists and an autism consultant agreed that conducting an FBA of A.B. was unnecessary because he

appeared to be doing well in the program and did not show significant maladaptive behaviors.  R. at 19-20.  The School staff discussed with BACA staff A.B.'s current level of academic performance, using that information to formulate certain goals and objectives for the proposed IEP.  Because the CCC determined that it had sufficient data to create an appropriate IEP for A.B., no further assessment of A.B.'s educational level was completed before school personnel developed a draft IEP.  R. at 20.

The proposed IEP calls for 6.5 hours of special education services each day in the CIP classroom, with 20 hours of one-on-one instruction with the classroom teacher or an instructional aid ("IA") per week as well as five hours of small group interaction weekly. Additionally, the IEP specifies that A.B. would receive one hour each week of speech and language therapy, physical therapy, and occupational therapy.  R. 2093.  The IEP further specifies that A.B. would receive special transportation every day and that he would follow a feeding protocol from Hershey Medical Center.  A.B. would receive extended school year services during the summer according to the IEP's provisions, but the proposed IEP does not mention whether such services were to be provided during other vacation periods.  The IEP contains no specific plan to transition A.B. from BACA to CIP.

The IEP contains goals for A.B. in the following areas: pre-academic visual performance (matching of pictures at 80% accuracy), communication-requesting (making five different requests using sign language when verbally prompted), motor imitation (imitating fine and gross motor movements with 80% accuracy), personal care skills-

dressing (pulling his pants up and down and putting on and removing his coat), and social skills (taking an offered item, offering an item to another person, and engaging in parallel play near other students with 80% success). The IEP also contains a section indicating that technical assistance would be necessary to implement A.B.'s IEP, including ongoing training of staff in ABA methods, consultation between the classroom teacher and an LBAC for one hour each week as well as three hours of outreach with a BCABA weekly. Although the IEP provides that "[t]eaching strategies and methodologies that incorporate strategies in applied behavioral analysis/verbal behavior" would be utilized to help A.B. accomplish the designated goals, it contains no further specifics regarding the manner in which the ABA-based strategies would be applied, the level of experience school staff had in employing ABA techniques, or how frequently such principles would be used. R. at 2094.

On May 18, 2010, A.B.'s Case Conference Committee ("CCC") met to discuss the proposed IEP for the 2010-2011 school term. The Parents expressed their desire that A.B. remain at BACA, but the School favored placement in the public school system. At the meeting, the CCC heard reports from Dr. Milar and BACA staff member Erin Orr regarding A.B.'s positive progress at BACA. Additionally, as Dr. Milar had noted in his independent educational evaluation ("IEE") performed immediately prior to the May 2010 CCC meeting, he again recommended that A.B.'s placement be continued at BACA. However, the Parents contend that, despite these reports, the only placement considered at the meeting was the CIP classroom. An advocate accompanied the Parents to the CCC

7

meeting and informed the School that A.B. would not be returning to public school for the next few years and the meeting concluded shortly after.

Dissatisfied with the CCC meeting, the Parents submitted a due process hearing request to the Indiana Department of Education ("IDOE") on May 21, 2010, alleging that the proposed IEP was inadequate and that, if implemented, A.B. would be denied a FAPE.  In their due process hearing request, the Parents sought utilization of an ABA therapy program, reimbursement for past and ongoing private services, a proper IEP, and continued private placement at BACA for A.B.  At the time the Parents requested a due process hearing, a finalized copy of A.B.'s IEP had not yet been completed.  The School sent the Parents a finalized copy on May 28, 2010.

On May 24, 2010, an independent hearing officer ("IHO") was assigned to hear the case and the due process hearing was held on October 5-8 and 11, 2010.  At the hearing, various witnesses testified regarding additional specifics about the CIP not contained in the IEP.  For example, Meg Cade, A.B.'s teacher of record ("TOR") who is also the classroom teacher at South Creek, testified that she would provide approximately 45-60 minutes of the instruction per day and the remainder would be provided by one or more of the three IA's who worked in the classroom.[4]  The STAR program is used in the CIP classroom, which is a data-based recording system for monitoring the progress of

---

[4] Ms. Cade is certified in special education and, at the time of the hearing, was working on a master's degree in education that included an emphasis on ABA and working with children with autism.  IA's work under the direct supervision of the TOR, but are not required to have college degrees.

instructional activities.  As a task is presented, a "+" or a "-" is used to denote whether the student performed the task correctly and the results are recorded in the student's individual binder.  Ms. Cade testified that she would likely begin instruction with A.B. in the office area of the classroom to minimize distractions in order to help with the transition from the familiarity of the area in which he works at BACA to his new surroundings.  The School's Director of Special Education testified that contacts had been made with appropriate professionals so that arrangements could be made to fulfill the section of the IEP requiring ongoing training for staff members and periodic consultation with an LBAC and a BCBA.

Over the Parents' objection, the IHO allowed Dr. Naomi Swiezy, a psychologist and Program Director for the Christian Sarkine Autism Treatment Center, to testify at the hearing.  Dr. Swiezy never directly worked with or observed A.B.  Instead, her assessment of the appropriateness of South Creek's CIP classroom was based on a profile of students with autism similar to A.B.  At the hearing, Dr. Swiezy testified that the CIP classroom has many research-supported features that provide an effective autism program such as a structured environment with data-driven and empirically supported instruction. Dr. Swiezy further testified that the STAR program utilized in the CIP classroom combines a variety of strategies, including some that are ABA-based, which she believes gives it the flexibility to meet the varied needs of children with autism.  R. at 5181.

The IHO rendered his decision on November 15, 2010, ruling in favor of the School, finding that A.B. had not been denied a FAPE and that placement in the public

9

school setting was appropriate.  R. at 24-25.  On January 18, 2011, the Parents appealed

the IHO's decision to the then-extant Indiana Board of Special Education Appeals

("BSEA").[5]  On March 3, 2011, after reviewing the administrative record, the BSEA

issued its decision.  The BSEA upheld the majority of the IHO's findings, but it did

expressly order extended school year services ("ESY") for A.B. "over vacations,

holidays, and breaks" (R. at 5305) and also found, contrary to the IHO's determination,

that the evidence established that "a transition plan [from BACA to the CIP classroom] is

necessary" and that "the School has not developed an appropriate plan for the transition

of the Student from the private placement back to the school setting for the current 2010-

2011 school year."  R. at 5304.

On April 4, 2011, the Parents filed their Complaint, seeking judicial review of the

administrative proceedings.  Plaintiffs and Defendants filed their respective motions for

summary judgment on September 2, 2011.

## Legal Analysis

### I.      Standard of Review

The standard of review in IDEA cases "differs from that governing the typical

review of summary judgment."  Heather S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir.

1997).  The IDEA provides that a court reviewing the outcome of a due process hearing:

"(i) shall receive the records of the administrative proceedings; (ii) shall hear additional

_____

[5]  On July 1, 2010, the BSEA was removed from Article 7 and Indiana now has a single
tier administrative review process.

evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  Here, the parties have submitted the administrative record for review, have filed cross motions for summary judgment, but no additional evidence has been heard.[6]  In this context, the dispute is decided on summary judgment, "which is the procedural vehicle for asking the judge to decide the case on the basis of the administrative record."  Evanston Cmty. Consolidated School Dist. Number 65 v. Michael M., 356 F.3d 798, 802 (7th Cir. 2004) (citing Hunger v. Leininger, 15 F.3d 664 (7th Cir. 1994)).

In reaching its determination, the district court must give "due weight" to the administrative decision and "must not substitute its 'notions of sound educational policy' for those of the school district."  Evanston Cmty., 356 F.3d at 802 (quoting Heather S., 125 F.3d at 1053).  Where, as here, review is based solely on the administrative record, with regard to issues of fact, the Court "owes considerable deference to the hearing officer, and may set aside the administrative order only if it is 'strongly convinced that the order is erroneous.'  This level of review is akin to the standards of clear error or substantial evidence."  Alex R. v. Forrestville Valley Comm. Unit Sch. Dist. #221, 375 F.3d 603, 611 (7th Cir. 2004) (quoting School Dist. v. Z.S., 295 F.3d 671, 675 (7th Cir. 2002)).  The hearing officer's decision is entitled to no deference with regard to issues of

---

[6] Although the Parents have filed affidavits with the Court, they have not established adequate justification to compel the Court to receive additional evidence.

law.  Id.

As the party challenging the outcome of the administrative proceedings, Plaintiffs bear the burden of proving their claims by a preponderance of the evidence.  See Alex R., 375 F.3d at 611 (citing Heather S., 125 F.3d at 1052).

## II.    The IDEA

Under the IDEA, a state that accepts federal funding to educate disabled children must adhere to certain conditions.  Beth B. v. Van Clay, 282 F.3d 493, 497 (7th Cir. 2002).  The IDEA requires a disabled child to be provided an education that is free, public, and appropriate ("FAPE"), 20 U.S.C. § 1412(a)(1), in the child's least restrictive environment ("LRE"), which means, to the maximum extent appropriate, with nondisabled children.  20 U.S.C. § 1412(a)(5).  The LRE requirement evidences "Congress's strong preference in favor of mainstreaming, but does not require, or even suggest, doing so when the regular classroom setting provides an unsatisfactory education."  Beth B., 282 F.3d at 497 (citations omitted).

A FAPE is defined as an educational program "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Board of Educ. of the Hendrick Hudson Central Sch. Dist. v. Rowley, 458 U.S. 176, 188-89 (1982).  A student is provided a FAPE when the state has complied with the IDEA's procedural and substantive requirements.  Board of Educ. of Tp. High School Dist. No. 211 v. Ross, 486 F.3d 267, 273-74 (7th Cir. 2007).  To comply with the procedural component, a school

district must follow the "guaranteed procedural safeguards" set forth in the Act.  20

U.S.C. § 1415(a).  Procedural violations are held to deny a student a FAPE only if they

"(I) impeded the child's right to a free appropriate public education; (II) significantly

impeded the parents' opportunity to participate in the decisionmaking process regarding

the provision of a free appropriate public education to the parents' child; or (III) caused a

deprivation of educational benefits."  20 U.S.C. § 1415(f)(3)(E)(ii).

The substantive component requires a school district to develop and implement an

appropriate IEP "reasonably calculated to provide some educational benefit to the child."

Todd v. Duneland Sch. Corp., 299 F.3d 899, 905 (7th Cir. 2002) (citing Rowley, 458 U.S.

at 206-07).  An IEP meets this standard when it is "likely to produce progress, not

regression or trivial educational advancement."  Alex R., 375 F.3d at 615 (citation and

quotations omitted).  Once a school district has satisfied the procedural and substantive

requirements of the IDEA, "the courts cannot require more; the purpose of the IDEA is to

open the door of public education to handicapped children, not to educate a handicapped

child to [his] highest potential."  Board of Educ. of Murphysboro Comm. Unit Sch. Dist.

No. 186 v. Ill. State Bd. of Educ., 41 F.3d 1162, 1166 (7th Cir. 1994) (citation and

quotations omitted).

## III.    The Procedural and Substantive Adequacy of the Proposed IEP

The IEP development process is intended to be a collaborative one between

parents, teachers, and special education administrators.  20 U.S.C. § 1414(d).  Here,

however, the collaborative process broke down and the parties reached an impasse

regarding placement before further specifics regarding A.B.'s IEP could be adequately discussed.  It is clear that the School entered the May 2010 case conference with the belief that it could provide A.B. with a FAPE in a public school setting, while the Parents were insistent that BACA was the only appropriate placement for their son.  Our review of the record persuades us that this impasse contributed to many of the issues that the Parents raise in their briefing in support of their motion for summary judgment.  We address those issues in the order that the parties have addressed them in their briefing.

A.   **Whether the IHO and the BSEA improperly relied on testimony to modify the explicit terms of the IEP**

The Parents first allege that the BSEA erred in upholding the IHO's determination that A.B.'s proposed IEP was adequate because the IHO improperly relied on testimony at the administrative hearing to modify the explicit terms of the IEP.  Rather than address this argument separately, we incorporate our discussion of it below when we address the specific sections of the IEP to which it is applicable.

B.   **Whether the BSEA improperly affirmed the IHO's ruling regarding the Parents' failure to object to the IEP's goals and objectives**

The Parents next argue that, at the due process hearing, the IHO improperly prevented them from objecting to the goals and objectives set forth in A.B.'s IEP when he concluded that, based on the information the School had at the time the IEP was developed, the goals and objectives contained therein were adequate under the IDEA's requirements.   The case law is clear, and both parties agree, that the adequacy of an IEP must be assessed as of the time it is developed and proposed.  See, e.g., Carlisle Area Sch.

14

v. Scott P., 62 F.3d 520, 534 (3d Cir. 1995) ("'[T]he measure and adequacy of an IEP can only be determined as of the time it is offered to the student, and not at some later date .... Neither the statute nor reason countenance "Monday Morning Quarterbacking" in evaluating the appropriateness of a child's placement.'") (quoting Fuhrmann v. East Hanover Bd. of Educ., 993 F.2d 1031, 1040 (3d Cir. 1993).  The Parents contend, however, that the IHO misinterpreted this principle by concluding that, because they did not express concern over the goals and objectives at the May 2010 case conference meeting, they "had waived their right to object to the IEP's goals and objectives."  Pls.' Mem. at 17.

We do not believe this is a fair characterization of the IHO's finding.  In ruling on this issue, the IHO stated as follows:

> An IEP must be evaluated at the time that it is developed and proposed.  In this matter the Student had not been attending the public school due to the provisions of settlement agreement.  Consequently school personnel had not been providing instruction.  The goals and objectives were based on information from BACA about how he was performing in the program.  During testimony the parents indicated that the Student had mastered many of the goals and objectives.  However they did not express concerns about the goals and objectives or their appropriateness at the May 2010 case conference.  Because an IEP is judged as of the time it is written its goals and objectives must be considered at the time they were prepared.  Therefore the parents cannot now assert that they are inappropriate.  The goals and objectives were based on information available at the time so they are judged to be appropriate and are supported by the evidence and testimony.

R. at 23-24.

If the IHO had categorically prevented the Parents from objecting to the adequacy

15

of the IEP and pursuing their due process right solely because they had not previously expressed their concern regarding the IEP's goals and objectives, we agree that would have been inappropriate.  See Letter to Lipsitt, 52 IDELR 47 (2008) ("Parents may file a due process complaint regarding an IEP even when they previously agreed to it.").  But the IHO did not find that the Parents had waived their right to object.  The IHO simply recognized that the adequacy of the IEP must be assessed at the time it was developed, and here, at the time A.B.'s IEP was developed, he had not been attending public school for a few years in line with the terms of the parties' settlement agreements, and thus, had not been receiving instruction from the School's personnel.  Accordingly, the School used information received from BACA employees regarding A.B.'s academic performance to create goals and objectives.  The IHO further recognized that, because the Parents did not express concern at that time, the information it had received from BACA was all the School could rely upon in developing the IEP.

There is no evidence that the Parents were denied an opportunity at the May 2010 case conference hearing to correct mistakes and update information regarding the goals and objectives proposed by the School, but because the collaborative process between the Parents and the School broke down over the issue of placement, the Parents did not take advantage of their opportunity to engage in collaborative dialogue.  In such situations, the Seventh Circuit has recognized that "the school district [is] left with no choice but to devise a plan without the meaningful input of [the] parents."  Hjortness v. Neenah Joint Sch. Dist., 507 F.3d 1060, 1066 (7th Cir. 2007).  Although at the due process hearing, the

16

Parents testified that A.B. had already accomplished many of the goals and objectives in the proposed IEP, the Parents have not shown that the School was aware of that fact at the time the IEP was developed nor have they shown that they questioned the services or offered alternative suggestions at the May 2010 case conference meeting such that the School would have been alerted to the need to alter the IEP.  It is not improper for the IHO to have considered the level of the Parents' involvement in the IEP development process when assessing the adequacy of the IEP at the time it was drafted.

   **C.   Whether the BSEA mistakenly determined that the Parents had waived the issue of predetermination**

The Parents next claim that the School improperly predetermined A.B.'s placement before the May 2010 case conference meeting.  However, the BSEA found that the Parents waived this issue by failing to raise it before the IHO.  In support of its waiver determination, the BSEA cited 511 IAC 7-45-9(g), which, although has since been amended, provided at the time of the administrative hearing in relevant part as follows: "Only matters raised in the initial due process hearing may be raised in a petition for review."  Because the Parents have not shown that they did in fact raise the issue before the IHO and have put forth nothing more than a conclusory argument in a footnote addressing this issue, they have failed to establish that the BSEA erred in determining that the Parents waived the predetermination issue.

Even if the BSEA had erred by considering the issue waived, there is insufficient evidence in the record from which to conclude that the School predetermined A.B.'s

placement.  Predetermination may be the type of procedural defect that deprives a child of

a FAPE when it has the effect of depriving the parents of meaningful participation in the

IEP process.  M.B. ex rel. Berns v. Hamilton Southeastern Schs., 668 F.3d 851, 861 (7th

Cir. 2011) (citing Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 857 (6th Cir.

2004)).  We do not find that to be the case here, however.

The Parents base their argument primarily on the fact that the School opened its

discussion in the May 2010 case conference meeting by proposing that A.B. return to

public school.  They also point to statements made at that meeting by Bill Dreibelbis, the

School's Special Education Director, reminding the group that the BACA placement had

been made as the result of two settlement agreements not because it had ever been

determined to be the appropriate placement and that it had been the position of the School

"since [A.B.] was in preschool, that the school wanted to serve [A.B.] in the public

school, could appropriately serve [A.B.] in the public school, and that the public school,

and the public school setting was the appropriate least restrictive placement for [A.B.]."

R. at 2096.

The mere fact that the School expressed its desire to serve A.B. in the public

school and that it long held the view that it could adequately do so does not automatically

lead to the conclusion that it improperly predetermined A.B.'s placement.  The IDEA

requires public schools, to the maximum extent appropriate, to provide disabled children

a FAPE in the least restrictive environment, meaning that the School is required to

educate A.B. with his nondisabled peers to the "maximum extent appropriate."  20 U.S.C.

§ 1412(a)(5)(A).  Given this requirement, the fact that the School came to the May 2010 case conference meeting expressing its view that public placement was both appropriate and the least restrictive environment for A.B., without more, does not establish that they improperly predetermined placement.  See Hjortness, 507 F.3d at 1066.  The Parents have failed to present any additional evidence that would lead to the conclusion that the School attempted to limit their participation at the meeting in any way that rises to the level of a denial of a FAPE.  To the contrary, it appears to have been the statement by the Parents' advocate that A.B. would not be returning to public school for at least a few years that brought the May 2010 case conference meeting to a close, terminating the possibility of any further participation on the Parents' part in the IEP development process.

### D.     Whether the lack of a plan to transition A.B. from private to public school denied him of a FAPE

Although the BSEA affirmed almost all aspects of the IHO's decision, it did modify the IHO's Finding of Fact #39 and Conclusion of Law #15, both related to the lack of a plan included in the proposed IEP to transition A.B. from private placement at BACA to the public school environment.  The BSEA amended Finding of Fact #39 to provide as follows: "A transition plan from the BACA to the Schools is necessary."  R. at 5304.  The IHO's Conclusion of Law #15 was amended by the BSEA to provide:

> The evidence and testimony did establish clearly that a transition plan is necessary but did not establish what its components should be.  Therefore, the School has not developed an appropriate plan for the transition of the Student from the private placement back to the school setting for the current 2010-2011 school year.

R. at 5304.  The BSEA did not modify the IHO's order regarding the lack of a transition plan, however, which provided:

> The teaching staff, ABA consultants, and the parents are to meet to discuss transition from BACA to the school.  However, a specific transition plan is not ordered.  Absent agreement on a transition plan, the Student will return to class on the first day of class after the beginning of the New Year, 2011.

R. at 5300.

The Parents contend that the IEP was "fatally flawed" because it did not include a plan to transition A.B. from BACA to the public school setting.  We give due deference to the BSEA's determination that, while the witnesses who addressed this issue at the due process hearing agreed that a transition plan was needed, their testimony was inconsistent regarding when and how such a plan should be implemented and what components it should include.  Accordingly, it is clear, as recognized by the IHO, that further discussion regarding the details of a transition plan was necessary.  However, as discussed above, in this case, the Parents and the School reached an impasse during the May 2010 case conference meeting on the issue of placement with the Parents' advocate indicating that A.B. would not be attending public school for the next few years.

This situation is similar to that addressed by our court in Brown v. Bartholomew Consolidated School Corp., No. 1:03-cv-939, 2005 WL 552194 (S.D. Ind. Feb. 4, 2005), remanded by, 442 F.3d 588 (7th Cir. 2006) (remanded to the district court to dismiss the case as moot because the student had moved to new school district), where the parents and the school could not agree on placement, and thus, the discussion between the parents

and school "simply never got far enough to work out a transition plan to a new program that the [parents] adamantly opposed." Id. at *7.  In Brown, court noted that, in such circumstances, it was "absurd for the family who blocked the new program to complain that the other side did not develop a detailed plan for the new program that would not be implemented without the family's consent." Id. at *8.

We find that a similar analysis applies here.  Because the discussion at the May 2010 case conference meeting broke down over the issue of placement, it would not have made sense for the School to have developed a plan to transition A.B. from private placement to the public school environment when it had been made clear to the School that the Parents were not going to accept the public school placement that was offered. As in Brown, we are unaware of any evidence indicating that the School was opposed to implementing transition measures or unwilling to discuss A.B.'s transition.  To the contrary, at the due process hearing Ms. Cade, the teacher of record in the CIP, testified, for example, that she planned to begin instructing A.B. in the office area of the classroom in order to minimize distractions while he adjusted to the public school setting.[7]  Given these facts and the specific circumstances in this case, we find that the Parents have failed to show that the lack of a plan to transition A.B. from private to public school placement in the proposed IEP violated the IDEA or Article 7.

---

[7] The Parents argue that hearing testimony cannot be used to bolster the IEP in such a manner.  However, we are not relying on this testimony to alter the provisions of the IEP, but merely to show that there is evidence that, had the parties not reached an impasse on the issue of placement, the School was in fact willing to address transition measures.

### E.      Whether the School staff is properly trained to implement the IEP

The Parents next argue that the IHO erred in his determination that the School's

staff was appropriately trained in the teaching methods to be used with A.B. such that

they could properly implement the proposed IEP.  First, we note that, because the parties'

settlement agreement provided that A.B. would remain at BACA until the beginning of

the 2010-2011 school year, even if the IEP had been immediately finalized in May 2010,

it was not going to be immediately implemented.  Thus, although the School's staff may

not have been adequately trained at the time the Parents filed for due process (only three

days after the truncated case conference committee meeting), as long as the evidence

shows that the School would have had qualified staff by the time the IEP was to be

implemented, the IDEA and Article 7 does not require more.

Here, the evidence shows that the School recognized that its personnel would need

ongoing training in order to implement the proposed IEP and that the IEP included

provisions addressing that need, including consultation from a lead behavior analyst for

one hour per week for the academic year as well as services of a BCBA outreach

professional for three hours per week for the academic year.  Although the Parents

contend that the IHO improperly relied upon testimony at the due process hearing to

bolster the IEP's provisions, our review of the record does not convince us of such.  The

IHO did reference the testimony of the School's Director of Special Education Services,

but the Director's testimony merely confirmed that the School had been in contact with

appropriate ABA professionals who could provide the services that were required by the

proposed IEP; it did not alter the provisions of IEP.

The IHO determined that, assisted by the weekly consultation with professionals trained and certified in ABA methods as provided for in the IEP, the teacher of record, who was an experienced teacher with training in autism, including the data collection procedure used at BACA, was well-trained to properly implement the proposed IEP as well as maintain responsibility for supervising the instructional aids who would also be working with A.B.  In assessing whether the School's personnel is properly qualified to implement the services and programs set forth in the IEP, we remain mindful that we are to give strong deference to the IHO on matters where educational expertise is relevant. Deal, 392 F.3d at 865 ("Federal courts are generalists with no expertise in the educational needs of handicapped children, and will benefit from the factfinding of a state agency with expertise in the field.") (quotations omitted).  Thus, giving due deference to these findings, we conclude that the evidence shows that the School would have had qualified staff by the time the IEP was to be implemented, had the Parents agreed to public school placement.

**F.      Whether the lack of details regarding extended school year services in the IEP constitutes a denial of a FAPE**

The proposed IEP provided that extended school year services "are necessary in order to provide a FAPE."  R. at 2093.  No further detail is included in the IEP regarding the nature of these services.  The Parents contend that more detailed extended school year plans should have been included in the IEP and that the IHO improperly relied upon

testimony by school officials in the due process hearing regarding how and when it would give such services to bolster the content of the IEP.

The IHO found that A.B. needed continuous instruction to avoid regression of skills, "including during school breaks, vacations, and other interim periods." R. at 5299. The IHO determined that such services did not need to be provided during the summer of 2010, however, because the parties' settlement agreement provided that A.B. was to remain in BACA until the beginning of the 2010-2011 school year. Although not specified in the IEP, the IHO relied on testimony from school officials during the due process hearing to conclude that extended school year services would be provided by the School as needed once A.B. returned to public school, including over breaks and holidays. R. at 5299. Upon review of the IHO's decision, the BSEA found that, although the IHO's findings and conclusions supported the need for extended school year services during breaks in the school year, such services were not clearly provided for in the orders as written. Appropriately, the BSEA modified the IHO's order to provide: "The proposed IEP dated May [2]8, 2010, is to be implemented as written upon the Student's return to school, including [extended school year] services over vacations, holidays, and breaks." R. at 5305.

The parties have pointed to nothing in the IDEA or Article 7 that specifies the level of detail needed for an extended school year provision in an IEP. Article 7 merely requires that the IEP include a statement of the student's need for extended school year services. See IND. ADMIN. CODE 7-42-6(f)(8). The IEP proposed by the School did

24

include such a provision, and the BSEA's modification of the IHO's order clarified that

extended school year services were required to be provided to A.B. over all vacations,

holidays, and breaks.  The Parents have failed to show that more detail was required

under the IDEA or Article 7.[8]

### G.    Whether the lack of a complete medical plan in the IEP constitutes a denial of a FAPE

The Parents next contend that A.B. was denied a FAPE because the proposed IEP

failed to include an adequate medical plan.  The IEP contains a provision labeled "health

plan" to address A.B.'s problems associated with feeding, and states that the School

would follow the feeding protocol recommended by the Hershey Medical Center that had

been obtained by the Parents.  The Parents claim that the School's failure to have

included an updated feeding protocol as well as provisions addressing A.B.'s other

medical concerns, such as his seizures, choking tendencies, or chromosome disorder

issues, resulted in the denial of a FAPE.

The record establishes that the School included as much information regarding

A.B.'s medical issues as it was aware of at the time the IEP was proposed.  Because the

May 2010 case conference meeting apparently ended before the "health plan" section of

the proposed IEP was discussed (due to the Parents' advocate's representation that A.B.

---

[8] In its motion for summary judgment, the School challenges the BSEA's revision of the IHO's decision with regard to the provision of extended school year services.  However, all that the BSEA did was clarify that the School was required to provide such services during breaks, holidays, and vacations, which all parties agree was necessary to provide A.B. with a FAPE. Thus, we decline to overturn that modification by the BSEA and <u>DENY AS MOOT</u> Defendants' motion for summary judgment as to that issue.

would not be returning to public school for several years), there is no indication that the School was aware that the medical issues the Parents now raise, to wit, that an updated feeding protocol was required, that A.B.'s seizure disorder required special precautions, and that A.B. needed to take medication during school hours, needed to be included in the IEP.  The School cannot be faulted for failing to include provisions to address issues it was not made aware existed.

Finally, although the Parents fault the IHO for concluding that A.B.'s seizure disorder "does not require a health plan," (R. at 30), the evidence shows that A.B.'s mother represented that A.B. did not have a record of drop head or any kind of grand mal seizures because they are prevented by medication that he takes outside of school hours. R. at 4636-37, 4651-52.  Given these facts, we see no error in the BSEA's affirmance of the IHO's determination that the IEP contained an adequate health plan, at least based on the information known to the School at the time the IEP was proposed.

### H.   Whether the IEP's Failure to Include an FBA and a BIP Denied A.B. of a FAPE

The Parents next argue that the School's failure to conduct a functional behavioral assessment ("FBA") and include a behavior intervention plan ("BIP") for A.B. in his IEP denied him of a FAPE.  Although the Parents apparently do not dispute that A.B. generally displayed good behavior while attending BACA,[9] the Parents point to prior

---

[9] In Dr. Milar's report, he noted that BACA staff reported that A.B.'s "[hitting] still occasionally occurs."  R. at 2066.

reports stating that A.B. exhibited aggressive behavior, such as scratching, pinching, and hitting as well as "temper tantrums."  R. at 3257.  However, the reports recounting the behavioral issues cited by the Parents are from 2008, approximately two years before the School conducted its observation at BACA to determine whether an FBA and BIP were necessary to include in the proposed IEP for the 2010-2011 school year.  In preparation for drafting the IEP, the School's autism consultant and the psychologist observed A.B. at BACA for three hours in order to assess the need for an FBA.  It is undisputed that during that time period A.B. did not exhibit behavioral problems nor did the BACA staff report to the School's representatives that A.B. was suffering from behavioral issues that needed attention at that time.  Given these facts, the IHO found that the lack of a BIP in A.B.'s proposed IEP did not deny him a FAPE.  Because our review of the evidence supports the IHO's conclusion that, at the time of the School's assessment of A.B., his behavior did not indicate the need for an FBA or BIP, we uphold the findings and conclusions of the IHO as affirmed by the BSEA in this regard.

**I.     Whether the School denied A.B. a FAPE by failing to timely evaluate him in all areas of need**

The Parents next challenge the BSEA's affirmance of the IHO's determination that the School had adequately and timely evaluated A.B. in his areas of need and contend that the School's failure to conduct a reevaluation of A.B. in all of his areas of need, including physical therapy, occupational therapy, and sign language needs, before developing the proposed IEP denied him of a FAPE.  Article 7 provides that a school must consider

reevaluation of all special needs students "at least once every three (3) years; however, reevaluation need not occur if the parent and the public agency agree that it is unnecessary." IND. ADMIN. CODE 7-40-8(b)(1).  In the case at bar, when the Parents at the School met in March 2010 to prepare for the May 2010 case conference meeting, the School had last evaluated A.B. in 2008, approximately two years earlier.  The IHO found that the parties agreed at that time that additional evaluation of A.B. was unnecessary, save for an updated psychological evaluation, and that the evaluation was paid for by the School and completed by a psychologist chosen by the Parents.  Given these facts, we find no clear error in the BSEA's decision adopting the IHO's determination that this evaluation met the requirements of Article 7 and the IDEA.

### J.   Whether the BSEA erred in upholding the IHO's ruling that placement of A.B. in the CIP was appropriate

We finally reach what the parties regard as the main dispute in this case: whether the BSEA erred in upholding the IHO's determination that placement of A.B. in the CIP was appropriate.  Here again, we are faced with the issue of how the parties' impasse on placement affected the IEP development process in this case.  The Parents argue that the words of their advocate should not be attributed to them, and that, just because their advocate represented at the May 2010 case conference meeting that the Student would not return to a public school facility for at least several years, it does not mean that they share that view.  Pl.'s Resp. at 24 n.12.  The Parents maintain that they would be willing to accept a placement besides BACA as long as it permitted A.B. to make educational

progress, but that in any event the IEP proposed by the School was insufficient.

The Parents argue that, if the School had only put as much effort into preparing for the May 2010 case conference meeting as it did into preparing for the due process hearing, they may have been open to accepting a public school placement.  But therein lies the problem – it appears to have been the Parents' advocate's statement that effectively ended the discussion at the May 2010 case conference meeting, preventing the parties from engaging further in the collaborative process.  We assess the adequacy of the public school placement with these circumstances in mind, which cause us to conclude that the Parents have failed to show that the IHO clearly erred in determining that the proposed placement at South Creek was reasonably calculated to enable A.B. to receive educational benefits.

It is beyond dispute that the CIP program does not offer the intense level of ABA therapy that is available at BACA.  But the IDEA does not require a school district "to provide the best possible education."  Todd v. Duneland Sch. Corp., 299 F.3d 899, 905 (7th Cir. 2002).  The statute requires only that a student's IEP "be reasonably calculated to enable the child to receive an educational benefit."  Evanston Comty. Consol. Sch. Dist. No. 65 v. Michael M., 356 F.3d 798, 802 (7th Cir. 2004).  The IHO did not clearly err in determining that the School's proposed placement met that standard.  The IHO found that, although the type of ABA program offered at BACA might provide benefit that is greater than what the School could offer, the CIP offered a program that met the IDEA's requirements and was properly structured to meet his needs.  In making this

29

determination, the IHO referenced the fact that the School offered scientifically based instructional methods based on ABA principles and behavioral approaches and noted that the School's staff would be receiving weekly consultation with professionals trained and certified in the ABA methods used at BACA.

Parents cannot expect to require a school district to select their preferred educational method over other alternatives so long as the method chosen by the district is otherwise sufficient. Rowley, 458 U.S. at 208 ("[O]nce a court determines that the requirements of the [IDEA] have been met, questions of methodology are for resolution by the States."). There is evidence in the record from various professionals from the Christian Sarkine Autism Treatment Center, including Dr. Swiezy, who testified regarding the benefits of the type of program used at CIP which incorporates a variety of strategies with a foundation in ABA principles. Although Dr. Swiezy[10] had not personally evaluated A.B., she testified that her assessment of the CIP program was based on a profile of students with autism similar to A.B., and opined that the program offered in A.B.'s IEP would meet the needs of a student fitting that profile. Even Dr. Sundberg, BACA's clinic director, testified that, although he doubted that the intensity of the BACA program "could be matched," he could not say that the program offered by the School was incapable of providing A.B. with educational benefits. R. at 4773-74.

---

[10] The parties present argument in their briefs regarding the relevant biases of each other's witnesses. We give due deference to the IHO's weighing of the credibility of the witnesses in making his determination.

The Parents also rely heavily on the testimony of Dr. Milar, the psychologist chosen by the Parents to evaluate A.B. in preparation for the May 2010 case conference, who recommended that A.B.'s placement be continued at BACA.  However, as pointed out by the School, rather than assessing whether A.B. could receive educational benefit through the proposed CIP placement, Dr. Milar instead weighed the risks and benefits of placement at each location and chose the better of the two.  See R. at 4313-14, 4334. That is simply not the standard under the IDEA.

For the foregoing reasons, we find that Plaintiffs have failed to establish that the IHO erred in determining that the School's proposed placement at the CIP with the educational program as described in the IEP and testimony was appropriate under the requirements of the IDEA.

**K.    Whether the IHO and BSEA should have considered whether A.B.'s continued placement at BACA was appropriate**

Finally, the Parents contend that the IHO and the BSEA should have considered the merits of the BACA program in assessing the appropriate placement for A.B. However, as the School argues, the standard under the IDEA is not whether one program is better than the other, but whether the program offered by the school district is reasonably calculated to provide educational benefit to the child, regardless of how it compares to a private school program.  See, e.g., Rowley, 458 U.S. at 188-89. Accordingly, having found that the CIP offered by the School was an appropriate placement, the IHO and BSEA did not err by failing to assess the merits of the BACA

31

program.

### IV.    Current Educational Placement

In their motion for summary judgment, the School requests that the Court define

A.B.'s "current educational placement" pending the final outcome of this litigation.  On

April 24, 2012, after the parties' cross-motions for summary judgment had been fully

briefed, the Parents filed a motion for preliminary injunction seeking to invoke the stay-

put provision of the IDEA, 20 U.S.C. § 1415(j), and to establish the Behavior Analysis

Center for Autism ("BACA 1") and its new branch, BACA Prep ("BACA 2"), as A.B.'s

current educational placement.  The facts relevant to these requests are as follows:

In his November 15, 2010 order, the IHO ordered that A.B. return to the CIP

classroom as was provided in the proposed IEP on the first day of class in January 2011.

However, A.B. did not enroll in South Creek and instead remained at BACA 1.  On

January 18, 2011, after receiving a filing extension, the Parents appealed to the BSEA,

which issued its decision on March 3, 2011, upholding the majority of the IHO's findings

as described above.  As part of that administrative review, the School had requested that

the BSEA define A.B.'s stay put placement.  The BSEA summarily denied the School's

request, but did not otherwise define A.B.'s "current educational placement" in its order.

Despite the rulings in favor of the School from both the IHO and the BSEA, A.B.

presently remains enrolled at BACA, for which the School has apparently been

continuing to pay the after-insurance costs.  However, BACA's director, Dr. Sundberg,

recently informed the Parents and the School that, because of his age, effective April 23,

2012, A.B. would be moved from the BACA 1 location to the BACA 2 campus to receive services.[11]  According to Dr. Sundberg's letter, the transfer "is a location change, not a program change."  Docket 34-1.  After receiving notification of the impending transfer, in a letter dated April 18, 2012, Southside Special Services Executive Director Lillian Youngblood informed BACA and the Parents that the School would not pay for services at BACA 2.  Docket No. 34-2.

On April 24, 2012, the Parents filed a motion for preliminary injunction seeking to invoke the stay-put provision and to establish BACA 1 and its new branch, BACA 2, as A.B.'s current educational placement.  It is not clear whether A.B. currently remains at BACA 1 or if he has been transferred to BACA 2 or whether the School has continued to pay the after-insurance costs of whichever program in which he is now enrolled.

When a student and his parents challenge the child's IEP, the following stay-put provision of the IDEA is triggered: "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child ...."  20 U.S.C. § 1415(j).  Indiana Law restates this statutory stay: "the student shall remain in the student's current educational placement during a due process hearing, administrative appeal, or judicial proceeding, unless the parties agree otherwise ...."  511

---

[11] Due to heavy enrollment growth, BACA 2 opened in October 2010 to treat older children.  According to the Parents, BACA 1 is currently utilized to treat children from ages 18 months through seven years old and BACA 2 treats children over the age of seven.  A.B. is currently ten years old and BACA has been requesting that he be transferred to BACA 2 since it opened.  However, the School has denied each request.

IND. ADMIN. CODE 7-45-7(u).

As noted above, A.B.'s placement at BACA was not made pursuant to an IEP, but rather was the result initially of a unilateral decision by the Parents to remove A.B. from his public school IEP placement and enroll him in a private facility.  In order to resolve due process proceedings filed by the Parents in connection with those events, the parties eventually reached settlement agreements pursuant to which the School agreed to pay the after-insurance costs of the Parents' chosen private school.  The verbal agreement pertinent to the instant motion was reached in 2009 and thereafter signed in 2010, which provided that the School would pay the after-insurance costs directly related to A.B.'s enrollment in BACA 1 "until but not including the first day of the 2010-11 Franklin Township Community School Corporation academic year."  R. at 3552.  The settlement agreement further provided that the parties were to meet at least four months prior to that expiration date in order to create an IEP for A.B. with appropriate programming and placement for the 2010-11 school year.

The IDEA does not define the term "educational placement," but as used in the IDEA, it "means educational program – not the particular institution where that program is implemented."  White v. Ascension Parish Sch. Bd., 343 F.3d 373, 379 (5th Cir. 2003) (citations omitted).  The IDEA's implementing regulations provide that the decision regarding placement is to be made by a "group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options."  34 C.F.R. § 300.116(a)(1).  A child's placement "[i]s based upon the

34

child's IEP."  34 C.F.R. § 300.116(b)(2).

Courts have held that, in situations where a parent unilaterally changes the placement of a child to a private facility and then a subsequent administrative or judicial decision expressly finds that private placement appropriate, that post-placement administrative or judicial determination can operate to define the child's "current educational placement."  See, e.g., K.D. v. Department of Educ., Hawaii, 665 F.3d 1110, 1118 (9th Cir. 2011) (collecting cases).  Here, although there has been no favorable agency or judicial decision ratifying Plaintiffs' unilateral placement at BACA, Plaintiffs contend that the parties' settlement agreements pursuant to which the School agreed to pay the after-insurance costs of placement at BACA for a specified period of time have the same effect.

Although the Seventh Circuit has not yet definitively ruled whether a settlement agreement may have the same legal effect as an affirmative agency decision to define a student's "current educational placement," the issue was substantively addressed by the dissent in Casey K. v. St. Anne Cmty. High Sch. Dist. No. 302, 400 F.3d 508 (7th Cir. 2005).  In Casey K., the majority declined to address the issue, stating that it was "an issue for another day" because it had not been raised by the school district.  Id. at 512.  Judge Sykes, dissenting, did address the issue, however.  Citing the provisions in the IDEA addressing placement, Judge Sykes opined as follows:

> Together, these provisions in the IDEA and its implementing regulations operate to establish this predicate for a *private school* "educational placement": there must first be a determination that the LEA [local

educational agency] either cannot or has not fulfilled its obligation to provide a free appropriate public education to the disabled child in the public school.  This determination made by the LEA itself, through the IEP process (in which case it makes the private school placement), or by a hearing officer or a court, where the LEA and the parents disagree about the appropriateness of the placement proposed by the IEP Team.  A unilateral private school placement by a child's parents does *not* become the child's "then-current educational placement" for purposes of stay-put unless and until the LEA acknowledges that mainstreaming in the public school is inappropriate or a hearing officer or court determines that the LEA has failed to timely provide a free appropriate public education.

Id. at 515-16.

Judge Sykes's analysis is consistent with the analysis of courts in our sister circuits who have addressed this issue.  For example, in K.D., the Ninth Circuit was faced with a similar set of circumstances.  In that case, as in ours, the settlement agreement at issue never called for "placement," but rather only addressed the issue of tuition reimbursement and provided a definite end-date at which point the agreement provided that the student would transition to a public school.  665 F.3d at 1119.  In K.D., the Ninth Circuit reasoned that it does not follow from the fact that the school had decided to settle its dispute with the parents by agreeing to pay tuition for a limited amount of time in order to avoid the costs associated with a due process hearing that the school had conducted "the detailed evaluation required to determine whether [the private school] was the proper institution for K.D. under the IDEA."  Id.  See also Zvi D. v. Ambach, 694 F.2d 904 (C.A.N.Y. 1982) (declining to define private school as current educational placement because no educational agency had determined that the parent's private placement was appropriate); cf. Bayonne Bd. of Educ. v. R.S., 954 F. Supp. 933 (D.N.J. 1997) (holding

36

that private institution was current educational placement because settlement agreement specifically called for "placement" and had no definite end date).

Applying the reasoning of these decisions, we hold that neither BACA 1 nor BACA 2 is A.B.'s stay-put placement because, pursuant to the parties' latest settlement agreement, the School agreed to pay the after-insurance costs only for a limited period of time, to wit, until the start of the 2010-2011 school year, and never affirmatively agreed that BACA was the proper educational placement for A.B. by placing him there pursuant to an IEP. Accordingly, we find that A.B.'s current educational placement for purposes of the stay-put provision is the proposed IEP and placement at South Creek.[12]

## V.   Conclusion

For the reasons detailed in this entry, we <u>GRANT</u> Defendants' Motion for Summary Judgment, except with regard to the issue of extended school year services, which we <u>DENY AS MOOT</u> as explained above, <u>DENY</u> Plaintiffs' Motion for Summary Judgment, and <u>DENY</u> Plaintiffs' Motion for Preliminary Injunction. The Student's current educational placement for purposes of the stay-put provision is the proposed IEP and placement at South Creek. We recognize that while the parties' dispute has made its way through the administrative and judicial processes, a significant amount of time has passed since the proposed IEP at issue in this litigation was supposed to have been

---

[12] The School has indicated that it would modify the IEP as necessary to address issues brought to its attention during the litigation process, such as medication delivery at school. We leave it to the parties to discuss necessary modifications.

implemented.  In the absence of any indication from the parties how this passage of time

has affected any of the issues before us, however, we have gone as far as we can go in our

analysis.

IT IS SO ORDERED.

Date:   09/28/2012
        _____

                                        _Sarah Evans Barker_____
                                        SARAH EVANS BARKER, JUDGE
                                        United States District Court
                                        Southern District of Indiana

Copies to:

Seamus P. Boyce
CHURCH CHURCH HITTLE & ANTRIM
spboyce@cchalaw.com

Alexander Phillip Pinegar
CHURCH CHURCH HITTLE & ANTRIM
apinegar@cchalaw.com

Mitchell M. Pote
LAW OFFICE OF MITCHELL M. POTE
mitchell.pote@gmail.com